David Henderson
LAW OFFICES OF DAVID HENDERSON
3003 Minnesota Drive, Suite 203
Anchorage, AK 99503
Phone: 907-677-1234
dh@henderson-law.com
Attorney for Jane Doe (J.R.F.)

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Jane Doe (J.R.F.), an individual,<br><br>Plaintiff,<br><br>v.<br><br>HILTON DOMESTIC OPERATING COMPANY INC.; APPLE SIX HOSPITALITY, INC; AND BRE SELECT HOTELS PROPERTIES LLC,<br><br>Defendants. | Case No. _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT
## TRIAL BY JURY DEMANDED

COMES NOW Plaintiff Jane Doe (J.R.F.), by and through the undersigned counsel,

files this Original Complaint against HILTON DOMESTIC OPERATING COMPANY,

INC; APPLE SIX HOSPITALITY, INC and BRE SELECT HOTELS PROPERTIES LLC,

as Defendants and respectfully shows the Court as follows:

## SUMMARY

1.     Jane Doe (J.R.F.) files this civil lawsuit seeking compensation for the harm

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                          1

she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                     2

not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (J.R.F.), with minimal risk of detection or interruption.

8. Defendants continued supporting traffickers, including Jane Doe (J.R.F.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the Hilton Garden Inn hotel located at 4555 Union Square Drive, Anchorage, Alaska 99503 (hereafter referred to as the "subject Hilton" or "subject Hilton Garden Inn"). Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## **PARTIES**

9. Jane Doe (J.R.F.) is a natural person who is currently a resident and citizen of Alaska.

10. Jane Doe (J.R.F.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

11. Hilton Domestic Operating Company Inc. is a Delaware corporation with its principal place of business in Virginia. It may be served through its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware, 19808.

12. Defendant Hilton Domestic Operating Company, Inc. will be referred to collectively as "Hilton Defendant." At all relevant times, they owned, operated, controlled, and managed the Hilton Garden Inn hotel located at 4555 Union Square Drive, Anchorage, Alaska 99503.

13. Defendant BRE Select Hotels Properties LLC is a Delaware limited liability company with its principal place of business in Delaware. It may be served through its registered agent Corporation Service Company, 9360 Glacier Highway, Suite 202, Juneau, AK 99801, or wherever it may be found.

14. Defendant BRE Select Hotels Properties LLC will be referred to as "Franchisee Defendants" or "Hilton Franchisees." From around May 2013 through at least December 2014, they owned, operated, controlled, and managed the Hilton Garden Inn located at 4555 Union Square Drive, Anchorage, Alaska, 99503.

15. Defendant Apple Six Hospitality, Inc is a Virginia corporation with its principal place of business in Virginia. It may be served through its registered agent C T Corporation System, 9360 Glacier Hwy, Ste. 202, Juneau, AK 99801.

16. Defendant Apple Six Hospitality will be referred to as "Franchisee Defendants" or "Hilton Franchisees." From around the time Plaintiff was first trafficked at this location to May of 2013, they owned, operated, controlled and managed the Hilton Garden Inn located at 4555 Union Square Drive, Anchorage, Alaska, 99503.

**JURISDICTION & VENUE**

17.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

19.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

**STATEMENT OF FACTS**

**I.     Jane Doe (J.R.F.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

20.     Jane Doe (J.R.F.) is a survivor of sex trafficking.

21.     Jane Doe (J.R.F.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts.  Jane Doe (J.R.F.)'s trafficker groomed her into believe that he cared for her and wanted to be her boyfriend. After her trafficker gained her trust through false romantic intentions, he forced her to engage in commercial sex for his financial benefit. Jane Doe (J.R.F.)'s trafficker controlled her by physical violence. Jane Doe (J.R.F.) was terrified to leave as she was scared of what physical harm, he would cause her if she did. At various times and in an ongoing manner between 2003 through December 2014, Jane Doe (J.R.F.) was trafficked at the subject Hilton Garden Inn.

22. At all relevant times, the Hilton Defendant was directly involved in the relevant operations of the subject Hilton Garden Inn, including directly participating in renting rooms at the subject Hilton Garden Inn. They also exercised systemic control over the Hilton Franchisees with respect to operation of the subject Hilton Garden Inn during their relevant time of ownership, such that Hilton Franchisees was Hilton's actual agent for operations of the subject Hilton Garden Inn directly related to the claims of Jane Doe (J.R.F.), including but not limited to, policies and procedures regarding hotel security, policies, and procedures regarding identification requirements and payment method requirements, policies and procedures regarding the response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity.

23. Jane Doe (J.R.F.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] These effects were obvious and apparent to the staff and management of the subject Hilton Garden Inn including effects on J.R.F.'s appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that J.R.F. was being continually subjected to coercion, control, and exploitation.

## II. The Hotel Industry's Role in Sex Trafficking and Hotel Defendants' Knowledge of the Problem.

---

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al* 6

24.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, the subject locations and the trafficking of Jane Doe (J.R.F.).

25.     Sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of the commercial exploitation of children.[7]

---

[4] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                              7

26.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking

27.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

28.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

---

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission.               End               Human               Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_f lags_handout.pdf (last visited April 13, 2023).
[9] *See Id.*

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

29. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and

respond to signs of sex trafficking.[10]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

30.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

31.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

32.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting

---

[10] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[12] *Id.*

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                              10

and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

33. All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendants to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

34. The most effective weapon against sexual exploitation and human trafficking is education and training.[13] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

---

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism*

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*      11

35.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

36.     Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

37.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3)

_Industry_, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[15] AHLA, _Free Online Training_, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

_Jane Doe v. Hilton Domestic Operating Co., Inc., et al_                                12

monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

38.     Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

39.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

40.     Accordingly, many hotel chains—including the Hilton Defendant's hotels—have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels. For example:

a. As early as 2010, Chinese police found a brothel operating inside a Hilton branded hotel, which prompted Hilton Worldwide officials to publicly claim to be working a code of conduct to prevent child sex trafficking at their branded properties.[16]

b. Hilton Worldwide, on behalf of its brands including Embassy Suites, joined the ECPAT-USA Code in 2011, acknowledging its duties to prevent and protect children from trafficking after over a year of advocacy directed at Hilton branded properties anti-trafficking advocates.[17]

c. Speaking on behalf of its brand, Hilton Worldwide stated in 2013: "Sex trafficking and sexual tourism is a large and growing problem worldwide, and Hilton Worldwide must never allow any of its properties, products, or services to be used in a manner that supports or enables any form of abuse and exploitation."[18]

d. In 2015, Hilton Worldwide conducted a global human rights assessment for all its branded properties, which identified the following risk: hotels may be used by criminals to traffic victims for exploitation.[19]

41. At all relevant times, the Hilton Defendant adopted a centralized approach to trafficking-related issues at all Hilton branded properties, including the subject Hilton Garden Inn. This has included maintaining centralized policies on detecting and response to trafficking, exercising centralized control over training related to sex trafficking, adopting centralized practices for reporting, and centralized monitoring and assessment of anti-trafficking efforts. Hilton also acted on behalf of all Hilton properties when communicating and partnering with external entities dedicated to eradicating sex trafficking in the hotel industry.

---

[16] https://www.nasdaq.com/articles/hilton-working-abolsish-child-sex-trafficking-2010-11-03

[17] https:stopchildlabororg/Hilton-signs-code-of-conduct-to-prevent-child-prostitution/

[18] https://thecode.my.salesforce-site.com/apex/publicPdf?id=0019000000GxgQIAAAZ&year=2013

[19] https://esg.hilton.com/wp-content/uploads/sites/3/2002/08/Hilton-FY-2021-Modern -Slavery-Act-Statement-1.pdf

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*      14

42. Unfortunately, Defendant's promises have proved empty time and again. While Defendant's statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like J.R.F.

**III. Sex Trafficking Has Long Been Prevalent at Hilton Hotels, and Hilton Defendant Has Known About It.**

43. Defendants' knowledge is *not* limited to general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants have known, since well before Jane Doe (J.R.F.)'s trafficking, that sex trafficking was ongoing and widespread at its properties.

**A. Sex Trafficking at Hilton Branded Hotels was well Known by Hilton Brand Defendant.**

44. The use of Hilton hotels, including Hilton Garden Inn properties, for sex trafficking is well known to the Hilton Defendant. The Hilton Defendant has known for years that pimps and traffickers use their hotels to carry out their crimes. Scores of news stories dating back for over a decade highlight Defendant's knowledge of such conduct.[20] Hilton Defendant, knew, or should have known, of the use of Hilton Garden Inn branded

hotels for sex trafficking ventures. Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter, are notable complaints that put the Hilton Defendant on notice of the frequent use of Hilton Garden Inn hotels including the subject Hilton Garden Inn for commercial sex and other associated illegal activity.

45.     Upon information and belief, Hilton monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories and online reviews confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Hilton branded hotels, including:

- In 2007 an employee of a Hampton Inn in Minnesota used the hotel for trafficking of minors, posting online advertisement to draw customers to the hotel to exploit teenagers.[21]

- In 2011, a man was arrested after posting an online advertisement for commercial sex services to be provided by a minor trafficking victim at a Hampton Inn in Washington and was found to have made more than $192,000.00 as a pimp over a period of eight months.[22]

- A 2009 review of a Hilton branded property in New York noted that the hotel bar was used by prostitutes to pick up guests, that this could be spotted from a mile off, and that the hotel staff allowed it.[23]

- A 2010 review of a Hilton property in New York stated "It's true what other reviewers have commented on regarding prostitutes/escorts in the hotel bars. If you are paying attention you will be able to pick them out. we sat right next to a

---

[21] Frederick Melo, *Burnsville / Sex ring sold high school 'party girls' on craigslist*, Twin Cities.com (July 12, 2007), https://www.twincities.com/2007/07/12/burnsville-sex-ring-sold-high-school-party-girls-on-craigslist/

[22] Steve Hunter, *Man reportedly made at least $192,000 in 8 months from prostitutes in Kent*, Seattle, Kent Reporter (Sept. 7, 2011), https://www.kentreporter.com/news/man-reportedly-made-at-least-192000-in-8-months-from-prostitutes-in-kent-seattle/

[23] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                        16

table one night when this was going on. the staff didn't seem to care. It's too bad because there were families in the bar also."[24]

- In 2011, a man was convicted of sex trafficking a minor at a Hilton branded hotel in Minnesota.[25]

- In 2011, a prostitute was raped when two men forced their way into her room at a Hilton branded property in New Hampshire.

- In 2012, a man was charged with sex trafficking at another Hilton branded hotel in Minnesota.[26]

- In 2012, a couple was charged with sex trafficking an 18-year-old girl with Autism Spectrum Disorder at a Hilton branded property.[27]

- In 2012, a man was charged with forced labor and sex trafficking following a sting at a Hilton branded hotel in California.[28]

- In 2012, arrests were made after police conducted a prostitution sting operation at a Hilton branded property in Memphis.[29]

- In 2013, eight arrests were made after several law enforcement response for prostitution activity at a Hampton Inn in Pennsylvania.[30]

- A 2013 review of a Hilton property in New York stated "But the prostitution going on in the lobby bar is so obvious The Waldorf must endorse it. Shame on

---

[24] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

[25] https://www.startribune.com/28-years-for-man-who-used-girl-for-prostitution/118163089/

[26] https://www.startribune.com/fridley-man-st-paul-woman-accused-of-prostituting-iowa-teen/138615249/

[27] https://www.twincities.com/2012/02/01/couple-charged-with-prostituting-runaway-iowa-girl-with-asperger-syndrome/

[28] https://www.nbclosangeles.com/news/local/long-beach-roshaun-kevin-nakia-porter-accused-human-trafficking-orange-county-pimp/1951757/

[29] https://www.actionnews5.com/story/20142585/suspected-prostitutes-busted-at-beale-area-hotel/

[30] Bryan Horwath, *8 arrests in prostitution sting: 4 Dickinson residents among those booked*, The Dickinson Press (Jan. 7, 2013), https://www.thedickinsonpress.com/news/8-arrests-in-prostitution-sting-4-dickinson-residents-among-those-booked.

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                    17

you!"[31]

- In 2013, a man was charged with forcing a woman into prostitution at a Hilton property in Florida.[32]

- In 2014, a sex trafficking victim was found murdered at a Hilton property in Oregon.[33]

46.    These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Hilton branded hotels. Moreover, on information and belief, the Hilton Brand Defendant is aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

47.    Upon information and belief, the Hilton Brand Defendant monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where J.R.F. was trafficked.

48.    Upon information and belief, at the time Jane Doe (J.R.F.) was trafficked at the subject Hilton Garden Inn, Hilton knew at least the following:

a.    The use of Hilton properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

---

[31] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html
[32] https://www.nbcmiami.com/news/local/broward-judge-sets-30000-bond-for-man-charged-with-human-trafficking/1923493/
[33] https://www.krem.com/article/news/nation/sex-trafficking-victim-found-slain-in-portland-hotel/293-157195643

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                    18

b. Commercial sex work occurring at its properties involved trafficking and compelled prostitution;

c. The Hilton Franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Hilton hotel properties;

d. Its efforts, if any, to stop facilitating sex trafficking in Hilton properties were not effective; and

e. Its policies and practices were facilitating sex trafficking by creating an environment conducive to sex trafficking where widespread and ongoing sex trafficking would continue to occur.

## IV. Jane Doe (J.R.F.)'s Sex Trafficking at the subject Hilton Garden Inn.

49. Between 2003 through December 2014, Jane Doe (J.R.F.)'s trafficker repeatedly brought her to the subject Hilton Garden Inn where they forced her to perform commercial sex services for his financial benefit. Jane Doe (J.R.F.)'s traffickers intentionally selected this hotel location, which they used to traffic both Jane Doe (J.R.F.) and other victims, as a desirable site for his sex trafficking operation.

### A. The Hilton Defendant and Franchisee Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Hilton Garden Inn.

50. Sex trafficking was widespread at the subject Hilton Garden Inn specifically.

51. The Hilton Brand Defendants knew or should have known about the sex trafficking pervasive at the subject Hilton Garden Inn on obvious indicators of this activity.

52. Based upon information and belief, a population of traffickers, including Jane Doe (J.R.F.)'s traffickers and other sex traffickers, had routinely used the subject Hilton

Garden Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents.

53. At the subject Hilton Garden Inn traffickers, including Jane Doe (J.R.F.)'s traffickers, operated with little regard for concealment, due to an implicit understanding between traffickers and Defendants. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

54. There were other victims being trafficked at the subject Hilton Garden Inn at the same time as Jane Doe (J.R.F.) and there were obvious signs these victims were being trafficked.

55. The conduct of subject Hilton Garden Inn and Hilton facilitated trafficking of a number of victims by a population consisting of multiple traffickers at the subject Hilton Garden Inn. Franchisee Defendants and Hilton developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

56. Upon information and belief, there were multiple trafficking victims exploited at the subject Hilton Garden Inn prior to Jane Doe (J.R.F.)'s trafficking who exhibited obvious "red flags" of trafficking matching industry-recognized signs. These obvious "red flags" were observed by hotel staff and management, including high volumes of men who were not registered guests in and out of their room at unusual times, requesting

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al* 20

clean towels and sheets frequently, wearing provocative clothing, obviously under the influence of drugs, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided Defendants with notice that these victims were being subject to violence, coercion, control, and exploitation.

57.     All knowledge from the staff at the subject Hilton Garden Inn is imputed to Defendants who knew about this widespread and ongoing trafficking at the subject Hilton Garden Inn, including the trafficking of Jane Doe (J.R.F.), through the direct observations of hotel staff, including management-level staff.

58.     Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Franchisee Defendants knew or should have known about the widespread trafficking at the subject Hilton Garden Inn based on non-public sources of information including but not limited to:

    a.  surveillance of the property;

    b.  internal investigations;

    c.  customer complaints;

d.  monitoring of customer feedback;

e.  information received from law enforcement; and

f.  other sources of non-public information available to Franchisee Defendants.

59.  Franchisee Defendants knew about or was willfully blind to the ongoing trafficking at the subject Hilton Garden Inn.

60.  At all material times, Hilton had robust reporting requirements in place for its hotels, including the Franchisee Defendants.

61.  Hilton required Franchisee Defendants to report all suspected instances of crime, including sex trafficking, at the subject Hilton Garden Inn.

62.  Hilton regularly received reports from Franchisee Defendants and others related to suspected instances of crime, including sex trafficking, at the subject Hilton Garden Inn.

63.  Hilton required Franchisee Defendants to allow Hilton to regularly inspect Hilton hotels, and Hilton regularly inspected the subject Hilton Garden Inn. Upon information and belief, during these inspections Hilton observed obvious signs of ongoing criminal activity, including red flags of sex trafficking activity.

64.  Upon information and belief, the Hilton Defendant knew or should have known about the widespread trafficking at the subject Hilton Garden Inn based on:

a.  The obligation of hotel staff and Franchisee Defendants to report suspected criminal activity, including sex trafficking, to Hilton;

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                    22

b. Hilton's regular monitoring of online reviews;

c. Hilton's collection and monitoring of customer surveys and complaints;

d. Hilton's requirement that Franchisee Defendants submit regular and detailed reports to Hilton about day-to-day hotel operations;

e. Hilton's collection and monitoring of data about guests at the subject Hilton Garden Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. Hilton's supervision and control over day-to-day operations of the subject Hilton Garden Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendants to use and through which Franchisee Defendants were obligated to allow Hilton to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. Hilton's regular inspections of the subject Hilton Garden Inn;

h. Hilton's employment of "field agents" to work with hotels on security issues, including trafficking issues;

i. Hilton's access to surveillance and security systems;

j. Information provided to Hilton by law enforcement; and

k. Other sources of information available to Hilton.

65. Upon information and belief, under the Hilton Brand Defendants' protocols, which on their face required hotel staff to report suspected criminal activity to the Hilton Brand Defendants, hotel staff and management were required to report and did report numerous instances of suspected sex trafficking to the Hilton Brand Defendants prior to J.R.F.'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Hilton Garden Inn.

66. Upon information and belief, the Hilton Brand Defendant observed obvious "red flags" of numerous instances of sex trafficking occurring at the subject Hilton Garden Inn based on their supervision and monitoring of the property.

67. Hilton and Franchisee Defendants had constructive knowledge of the widespread and ongoing trafficking at the subject Hilton Garden Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel. Specifically, Hilton and Franchisee Defendants each failed to detect sex trafficking that would have been detectable had the exercised ordinary diligence in response to their knowledge of the problem of sex trafficking in their operations and in response to the obvious red flags of sex trafficking at the subject Hilton Garden Inn.

68. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Hilton-branded hotels, and at the subject Hilton Garden Inn, Hilton and Franchisee Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If Hilton and Franchisee Defendants had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the subject Hilton Garden Inn and that they were benefiting from such trafficking.

69. Hilton Defendant knew or should have known that this widespread and ongoing trafficking at the subject Hilton Garden Inn was the result of its policies and

procedures and that, by continuing its operations, it would continue to facilitate widespread sex trafficking at this hotel.

**B. The activities of Jane Doe (J.R.F.)'s traffickers at the subject Hilton Garden Inn were apparent and obvious.**

70.     One of the lives devalued and otherwise adversely affected by Defendants' inattention to the prevention and eradication of sex trafficking was Jane Doe (J.R.F.).

71.     From approximately 2003 through December 2014, Jane Doe (J.R.F.) was repeatedly trafficked for sex at the subject Hilton Garden Inn.  During the period of several years that Jane Doe (J.R.F.) was repeatedly trafficked at the subject Hilton Garden Inn, there were open and obvious signs of her trafficking as well as abuse that matched up with industry recognized red flags.

72.     Hotel staff would place her and her trafficker in rooms that were away from other guests.

73.     Jane Doe (J.R.F.)'s trafficker was often present with Jane Doe at check in and would linger around the hotel or in the parking lot while she was with a john.

74.     Jane Doe (J.R.F.) would have very little possessions with her when she arrived at the subject Hilton Garden Inn.

75.     Jane Doe (J.R.F.)'s trafficker required her to dress in provocative clothing.

76.     The hotel rooms in which Jane Doe (J.R.F.) was trafficked were frequently in a specified area of the hotel to make it easier for johns to come and go.

77. There was also heavy foot traffic in and out of Jane Doe (J.R.F.)'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

78. It was obvious and apparent to a reasonable observer that he was surveilling Jane Doe (J.R.F.) as she was forced to engage in commercial sex activities. This is another sign of a sex trafficking venture occurring that the hotel staff observed.

79. Jane Doe (J.R.F.)'s trafficking had profound effects on her, consistent with the above-described "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject Hilton Garden Inn, including effects on Jane Doe (J.R.F.)'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Hotel staff and Franchisee Defendants had a duty to report these signs to Hilton and, based upon information and belief, did in fact report to Hilton with respect to Jane Doe (J.R.F.) and other sex trafficking victims prior to and after the trafficking of Jane Doe (J.R.F.)

80. At the relevant time, it was well known in the hotel industry that these specific "red flags" associated with Jane Doe (J.R.F.)'s trafficking at the subject Hilton Garden Inn were common indicators of sex trafficking. Franchisee Defendants and the

Hilton Defendant had been trained and educated about this and, therefore, knew that such signs were highly suggestive of sex trafficking.

81. Based on direct observation of these obvious signs and their familiarity with Jane Doe (J.R.F.)'s trafficker, hotel staff and Franchisee Defendants knew about or were willfully blind to Jane Doe (J.R.F.)'s trafficking at the subject Hilton Garden Inn.

82. Knowledge of Jane Doe (J.R.F.)'s trafficking is imputed to Hilton Defendant because Franchisee Defendants and the hotel staff were the Hilton Defendant's agents and subagents.

83. Given the obvious signs of Jane Doe (J.R.F.)'s trafficking, Franchisee Defendants and the hotel staff were required to report suspicion of Jane Doe (J.R.F.)'s trafficking to Hilton.

84. Hilton knew or had reason to know about Jane Doe (J.R.F.)'s trafficking based on the numerous tools that it used to supervise the hotel.

85. Hilton Defendants and Franchisee Defendants are charged with constructive knowledge of Jane Doe (J.R.F.)'s trafficking at the subject Hilton Garden Inn because, had they exercised ordinary diligence, they would have detected this trafficking. This trafficking was known or (with the exercise of reasonable diligence) knowable to Hilton Defendant and Franchisee Defendants. Had Franchisee Defendants and Hilton followed reasonable industry practices, Jane Doe (J.R.F.)'s trafficking would have been detected.

86. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Hilton hotels, and at the subject Hilton Garden Inn specifically, Franchisee Defendants and Hilton Defendant each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If Defendants had used reasonable prudence, they would have been aware that they were benefiting from Jane Doe (J.R.F.)'s trafficking.

C. **Franchisee Defendants facilitated the trafficking activity at the subject Hilton Garden Inn, that resulted in the trafficking of Jane Doe (J.R.F.).**

87. Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (J.R.F.) at the subject Hilton Garden Inn because the trafficking was the direct result of Defendants facilitating her trafficking at the property.

88. Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject Hilton Garden Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendants, of human trafficking occurring in the subject Hilton Garden Inn.

89. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Hilton Garden Inn, Franchisee Defendants continued renting

rooms to these traffickers, including the rooms used to sexually exploit victims, including J.R.F.

90.　Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (J.R.F.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (J.R.F.)'s sexual exploitation.

91.　Franchisee Defendants also facilitated widespread trafficking at the subject Hilton Garden Inn, including the trafficking of Jane Doe (J.R.F.), in ways including:

a. Developing relationships with traffickers and creating an understanding that these traffickers could operate at the hotel without risk of interference.

b. Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

c. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d. Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

f. Continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of Jane Doe (J.R.F.) and other victims.

g. Accommodating specific requests made by traffickers.

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*　　　　　　　　　　29

h. Failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site.

92. Franchisee Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (J.R.F.).

93. Franchisee Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

94. Policies purportedly enacted and enforced by Hilton Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the subject Hilton Garden Inn by either Hilton Defendant or Franchisee Defendants, Jane Doe (J.R.F.)'s traffickers were able to continue the trafficking venture at the subject Hilton Garden Inn. Had the Hilton Defendant enforced the policies and procedures they enacted to prevent trafficking from occurring within their Hilton Garden Inn branded hotels after observing an obvious sign of trafficking as described above, Jane Doe (J.R.F.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the subject Hilton Garden Inn. Furthermore, had Franchisee Defendants properly followed the franchise policies enacted by Hilton to identify and prevent trafficking from occurring at Hilton Garden Inn branded hotels as described above, Jane Doe (J.R.F.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the subject Hilton Garden Inn.

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                    30

**D. Hilton Defendant facilitated the trafficking activity at the subject Hilton Garden Inn, that resulted in the trafficking of Jane Doe (J.R.F.).**

95.     Hilton directly participated in and retained day-to-day control over renting rooms at the subject Hilton Garden Inn. Upon information and belief, Hilton directly participated in and retained day-to-day control over renting rooms at the subject Hilton Garden Inn by, in ways including:

    a. Hilton controlled all details of the guest reservation, check-in, and payment processes through both its management and control over all systems used for those processes and its adoption of detailed and specific policies governing the means and methods hotel staff used for each of these processes.

    b. Hilton directly made reservations for rooms at the subject Hilton Garden Inn and accepted payment for those rooms through a central reservation system that it controlled and operated.

    c. Hilton controlled extension of existing room reservations and guests had to contact Hilton to extend reservations.

    d. Hilton controlled the payment methods that would be accepted and had access to information about which guests used which payment methods through its backend access to the reservation and payment systems.

    e. Hilton controlled policies and protocols for guest identity verification at the time of check in and retained control over guest identity information.

    f. Hilton controlled room rates, required discounts, mandatory fees, and rewards programs.

    g. Hilton controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

    h. Hilton collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Hilton Garden Inn, including the following categories of information: name, contact information (mailing address, email address, phone number), nationality, date of birth, gender, payment card information, Hilton Honors number, passport information, preferred language, room preference, room selection and assignment, arrival time,

additional guest names, corporate travel planner contact information (name, title, company, business phone, email and address), corporate number and name, travel agent number and name, airline partner number and name, vehicle information, images or footage captured by closed circuit television (CCTV), internet or other electronic network activity information, including information regarding a customer's interaction with Hilton websites, applications, or advertisements, IP addresses, Session IDs, Booking engine, Whether a customer has a Hilton and American Express co-branded credit card, whether a customer's Hilton and Amazon accounts are linked, whether a customer's Hilton and Lyft accounts are linked, geolocation information, device information, social media information, demographics data, a customer's usability preferences regarding Hilton's website (such as a customer's email preferences, MyWay preferences, and opt-out preferences), description of a complaint that a customer makes to Hilton, including a customer's free form textual feedback if the customer is a Hilton Honors member, customer ratings and survey responses, and free form textual feedback.[34]

i.  Hilton established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Hilton Garden Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

j.  Hilton required the subject Hilton Garden Inn to use their property management system, which was owned, maintained, controlled, and operated by Hilton, for virtually all aspects of hotel operations regarding room reservations and payment.

96.  Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject hotel, Hilton Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit Jane Doe (J.R.F.)

---

[34] https://www.hilton.com/en/p/global-privacy-statement/

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                    32

97. Hilton knew or should have known that Jane Doe (J.R.F.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them, for financial gain, hotel rooms and related services to facilitate Jane Doe (J.R.F.)'s sexual exploitation.

98. Hilton rented rooms in a way that it knew or should have known facilitated rental and use of those rooms by sex traffickers, including Jane Doe (J.R.F.)'s traffickers.

99. Hilton retained control over the details and methods of aspects of the operation of the subject Hilton Garden Inn that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, Hilton participated in a venture with sex traffickers who were using the subject Hilton Garden Inn as a venue for their trafficking. Moreover, as a result of this retained control, Hilton had both the opportunity and the duty to prevent Jane Doe (J.R.F.)'s trafficking. Hilton directly participated in and retained control over specific aspects of the operation of the subject Hilton Garden Inn related to trafficking by:

   a. assuming joint responsibility with Franchisee Defendants for detecting and preventing human trafficking at the hotel property;

   b. directing, assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to Hilton;

   c. directing, assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

   d. directing, assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al* 33

e.  employing field-based associates who work with hotels on trafficking issues;

f.  assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g.  establishing systems for guests to report criminal activity and hotel security issues to franchisor;

h.  retaining control over the security of the subject Hilton Garden Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the subject Hilton Garden Inn;

i.  retaining control over property-specific data and customer data, , including names, payment information, reservation history, browsing data, and other details associated with their stay, from the subject Hilton Garden Inn — which they obtained by controlling the means and methods by which Franchisee Defendants recorded, stored, and reported that data—such that they had actual or constructive knowledge—about the ongoing trafficking that was occurring at the subject Hilton Garden Inn during the time Plaintiff was trafficked there;

j.  requiring Franchisee Defendants to provide Wi-Fi/internet access to guests;

k.  mandating the specific tools and systems that Franchisee Defendants must use to provide Wi-Fi/internet access to guests;

l.  setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

m.  requiring Franchisee Defendants to use a system to monitor and track housekeeping requests;

n.  setting policies for when and how housekeeping services are provided; and

o.  collecting and monitoring data that shows patterns of use of housekeeping services.

100.  Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Hilton Garden Inn, Hilton

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                      34

Defendant continued participating in a venture at that hotel, with their hotel staff, in a way that Hilton knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a. While Hilton publicly committed to the EPCAT Code in 2011, they unreasonably delayed and failed to take any significant steps to implement that commitment for several years.[35]

b. Hilton adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining Franchisee Defendants and front-line hotel staff regarding issues related to human trafficking.

c. Hilton delayed implementation of anti-trafficking training. While Hilton Worldwide committed to the EPCAT Code in 2011, it had completed no training in 2011 and 2012 and had only trained 879 individuals, across all its brands, by the time of its 2013 report.[36]

d. Hilton implicitly condoned and endorsed its staff's repeated decisions not to report or respond to trafficking appropriately.

e. Hilton ignored policies that they had purportedly enacted and implemented.

f. Hilton continued to implement and rely on policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Hilton Garden Inn.

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at the subject Hilton Garden Inn, Hilton declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at Hilton properties.

---

[35] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2012; https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

[36] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al* 35

h. Hilton attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

i. Hilton allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

j. Hilton adopted and required their staff to adopt check in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

k. Hilton continued to allow the subject Hilton Garden Inn to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy its brand affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

l. Hilton provided traffickers with access to internet services that Hilton knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

101. If Hilton had exercised reasonable diligence when operating the Hilton properties and in the areas where it retained control, Hilton would have prevented the Hilton properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.R.F.). Instead, Hilton engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.R.F.).

102. The Hilton Brand Defendants should have known about (J.R.F.)'s trafficking because it retained control over the training of the staff of the subject Hilton Garden Inn regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel

facilities for sexual exploitation and human trafficking. If the Hilton Brand Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of (J.R.F.) at the subject Hilton Garden Inn. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Brand Defendant.

103. The Hilton Brand Defendant should have known about (J.R.F.)'s trafficking because they also retained control over the response of Hilton hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Hilton Brand Defendant facilitated sex trafficking, including the sex trafficking of (J.R.F.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Brand Defendant.

104. The Hilton Brand Defendants also should have known about (J.R.F.)'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including subject Hilton Garden Inn, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the subject Hilton Garden Inn. The Hilton Brand Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including (J.R.F.). Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Brand Defendant.

105.    The Hilton Brand Defendant also should have known about (J.R.F.)'s trafficking because they retained control over the security of the subject Hilton Garden Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the subject Hilton Garden Inn. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Hilton Brand Defendant had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Brand Defendant.

106.    (J.R.F.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Hilton Brand Defendant had used reasonable diligence in the aspects of hotel operations over which they retained control.

107.    Moreover, (J.R.F.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the subject Hilton Garden Inn over an extended period because the Hilton Brand Defendants adopted policies and practices that insulated (J.R.F.)'s traffickers from significant risk of detection or disruption.

108. The Hilton Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including J.R.F.

109. The Hilton Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## V.  Defendants' benefit from ventures at the subject Hilton Garden Inn.

110. Each of the Defendants knowingly received benefits from participating in the ventures that facilitated trafficking, including Jane Doe (J.R.F.)'s trafficking, at the subject Hilton Garden Inn. Each Defendant directly benefited from facilitating trafficking at the subject Hilton Garden Inn. Each Defendant received monetary payment as the result of the rental of rooms at the subject Hilton Garden Inn, including the rooms where Jane Doe (J.R.F.) was being trafficked.

111. The Hilton Defendant and Franchisee Defendants profited from every stay by every patron at the subject Hilton Garden Inn, both from room rentals and from other hotel services.

112. Hilton Defendant generate substantial income from operations of hotels such as the subject Hilton Garden Inn. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement, Hilton received a share of the profits from room rentals collected by Franchisee Defendants during their specific period of ownership at the subject Hilton Garden Inn. Hilton also profits from

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                              39

reservation fees, marketing fees, loyalty program fees, and other miscellaneous ancillary fees. The fees generated by Hilton are primarily based on gross room rentals; therefore, Hilton's profits increase with each room rental to traffickers, including Jane Doe (J.R.F.)'s trafficker.

113. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the subject Hilton Garden Inn specifically.

114. In ways described more fully above, Hilton Defendants and Franchisee Defendants knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship with sex traffickers at the subject Hilton Garden Inn (hereinafter "Venture 1").

115. Hilton Defendant and Franchisee Defendants, during their respective years of ownership, formed this continuous business relationship with the traffickers at the subject Hilton Garden Inn by continuing to rent rooms to traffickers (including Jane Doe (J.R.F.)'s traffickers) after Hilton and Franchisee Defendants knew or should have known that the rooms were being used for unlawful trafficking.

116. This implicit understanding developed because sex traffickers, including Jane Doe (J.R.F.)'s sex traffickers, frequently used the subject Hilton Garden Inn for their trafficking knowing that staff members would look the other way. This occurred because

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                                40

of the acts and omissions of Hilton Defendants and Franchisee Defendants that created a favorable environment for sex trafficking to flourish.

117. Both Hilton Defendant and Franchisee Defendants, during their respective years of ownership, participated in this venture by acting jointly to rent rooms to traffickers as further described throughout this pleading. During their time of ownership, Franchisee Defendants provided "boots on the ground" for reservations, and Hilton directly participated in renting rooms to guests, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this pleading. Each Defendant participated in the venture by continuing to rent rooms to traffickers after they knew or should have known that hotel rooms were being used for unlawful trafficking.

118. Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced as set forth immediately below, among other things:

119. These traffickers were familiar to the staff at the subject Hilton Garden Inn;

120. These traffickers took few or no steps to conceal their activities from the staff at the subject Hilton Garden Inn but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

121. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

122. Defendants provided additional services to traffickers (including Jane Doe (J.R.F.)'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

123. The criminal traffickers operating at the subject Hilton Garden Inn as part of Venture 1 violated 18 U.S.C. §1591 as to victims trafficked at the hotel, including J.R.F.

124. Jane Doe (J.R.F.)'s trafficking at the subject Hilton Garden Inn was a result of each Defendant's participation in Venture 1 with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (J.R.F.)'s trafficking at the subject Hilton Garden Inn.

125. In ways described more fully above, Defendants also knowingly received a financial benefit from participating in a commercial venture with one another operating the subject Hilton Garden Inn (hereinafter "Venture 2").

126. Hilton Defendants and Franchisee Defendants—regarding their respective years of ownership—had a longstanding business relationship pursuant to which they jointly participated in operation of the subject Hilton Garden Inn with a shared goal of maximizing revenue, including gross room revenue.

127. Defendants were jointly responsible for customer safety and, specifically, prevention of human trafficking at the subject Hilton Garden Inn. Hilton Defendant retained control over, and thus had a duty with respect to, customer safety at the subject Hilton Garden Inn generally and specifically regarding detection of and response to human trafficking at the subject Hilton Garden Inn.

128. Venture 2 violated the TVRPA through the widespread sex trafficking at subject Hilton Garden Inn, including the trafficking of Jane Doe (J.R.F.), and through the conduct of Franchisee Defendants which violated the TVPRA by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

129. Despite actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Hilton participated in the venture by continuing to associate with Franchisee Defendants to operate the subject Hilton Garden Inn in a way that Hilton knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (J.R.F.) Hilton continued providing Franchisee Defendants with operational support, use of its trademarks, marketing services, and other resources to operate the subject Hilton Garden Inn in a way that Hilton knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI. Franchisee Defendants operated as Hilton's agent.

130. In addition to Hilton's direct involvement in the venture through the means outlined above, Hilton participated in the venture through the acts and omissions of

Franchisee Defendants during their respective years of ownership, its agent, and the hotel staff, its subagents for the purpose of operating the subject Hilton Garden Inn.

131. The Hilton Defendant exercised an ongoing and systemic right of control over Franchisee Defendants regarding the operation of the subject Hilton Garden Inn.

132. At all relevant times respective of their years of ownership, Franchisee Defendants were subject to and required to comply with detailed written policies and manuals and other formal and informal protocols, directives, mandates, and expectations imposed by Hilton. These standards, protocols, and requirements:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at the subject Hilton Garden Inn; and

    b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishing, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

    c. dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the subject Hilton Garden Inn; and

    d. significantly exceeded what was necessary for Hilton to protect its registered trademarks.

133. Hilton regularly inspected the subject Hilton Garden Inn.

134. Hilton required Franchisee Defendants to adhere to strict requirements, including but not limited to:

    a. standardized training methods for employees at the subject Hilton Garden Inn;

b. building and maintaining the subject Hilton Garden Inn in a manner specified by Hilton;

c. standardized or strict rules of operation for the subject Hilton Garden Inn;

d. regular inspection of the subject Hilton Garden Inn and its operation by Hilton Defendants;

e. prices fixed by Hilton Defendants for the subject Hilton Garden Inn;

f. Hilton Defendant provided an online booking platform for the subject Hilton Garden Inn;

g. Hilton Defendant established reporting requirements for the subject Hilton Garden Inn; and

h. other actions that deprived Franchisee Defendants of independence in the business operations of the subject Hilton Garden Inn.

135. In addition to the ways described above, upon information and belief, Hilton exercised and reserved the right to exercise systemic and pervasive control over day-to-day operation of the subject Hilton Garden Inn in ways including but not limited to the following:

a. Hilton required their staff and management of the subject Hilton Garden Inn to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations.

b. Hilton retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected. Hilton required onsite and online training for all hotel staff, including mandatory training for all hotel-based employees at the time of hire and ongoing training as dictated by Hilton.

c. Hilton controlled the details of training conducted for hotel staff by requiring the use of standardized training methods and materials.

d. Hilton set required staffing levels for the subject Hilton Garden Inn.

e. Hilton adopted detailed job descriptions for each position at the subject Hilton Garden Inn and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

f. Hilton exercised control over the hiring process for hotel staff by mandating interview techniques, setting hiring criteria, and controlling requirements for background and reference check.

g. Hilton retained the right to approve or reject hiring of the general manager of the hotel.

h. Hilton imposed and enforced detailed requirements for all aspects of hotel facilities.

i. Hilton required that the subject Hilton Garden Inn use Hilton's preferred vendors to purchase goods necessary for day-to-day operation of the hotel.

j. Hilton entered into exclusive purchasing agreements with vendors, including through the Primary Supplier Distribution Program, and required the subject Hilton Garden Inn to purchase goods and supplies from a single source selected by Hilton. Hilton did not do this solely to assure uniformity of brand but, instead, did this for their own financial benefit as they routinely received rebates from vendors selected through these purchasing agreements.

k. Hilton controlled channels for guests to report complaints or provide feedback about the subject Hilton Garden Inn.

l. Hilton required the subject Hilton Garden Inn to participate in a Guest Assistance Program and retained the right to require the subject Hilton Garden Inn to take specific actions to resolve guest complaints, including providing rebates and cash refunds.

m. Hilton required the subject Hilton Garden Inn to use systems Hilton owned, operated, and controlled for, among other things, revenue management, hotel operations, and business intelligence gathering and analysis.

n. Hilton provided day-to-day services through the back-end operation of the property management system used for virtually all aspects of running the subject Hilton Garden Inn.

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                          46

o.  Hilton required the subject Hilton Garden Inn to use electronic mail systems maintained by Hilton, which are maintained, controlled, and monitored by Hilton.

p.  Hilton was directly involved in installing hardware and software systems and providing day-to-day maintenance and repair of these systems at the subject Hilton Garden Inn.

q.  Hilton controlled all marketing for the subject Hilton Garden Inn. Hilton exercised this control on a day-to-day basis by going beyond setting standards and, instead, requiring the subject Hilton Garden Inn to get prior approval of any marketing or advertising materials.

r.  Hilton set detailed standards regarding the insurance the subject Hilton Garden Inn was required to purchase and maintain, including requirements for specific provisions that must be in the policy, who must be insured, in what amount, and what insurers the subject Hilton Garden Inn could use.

s.  Hilton imposed detailed recordkeeping and reporting requirements on the subject Hilton Garden Inn regarding virtually all aspects of hotel operation, including internal operations.

t.  Hilton retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

u.  Hilton retained the right to inspect the subject Hilton Garden Inn, including through unannounced inspections, and to perform audits. They inspected and audited virtually all aspects of hotel operations, including internal operations and issues related to guest safety.

v.  Hilton retained control to require the subject Hilton Garden Inn to make operational changes within a time established by Hilton.

w.  Hilton monitored day-to-day operations of the subject Hilton Garden Inn through constant monitoring of guest surveys, online reviews, customer complaints, and data from the back-end of the systems it required the subject Hilton Garden Inn to use.

136.  Hilton Defendant specifically retained control over the day-to-day operation of Franchisee Defendants with regard to aspects of their operation of the subject Hilton Garden Inn that caused Jane Doe (J.R.F.)'s harm, including but not limited to reservation

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                                    47

policies and procedures, staff training, security policies, and training, education polices, and procedure regarding human trafficking.

137. Hilton Defendant regularly advised Franchisee Defendants on operational changes necessary for it to remain in compliance with Hilton's strict regulations.

138. Hilton Defendant had the ability to impose fees or fines on Franchisee Defendants. Furthermore, at all material times, Hilton retained an absolute right to cancel its franchise agreement with Franchisee Defendants if Hilton's rules were violated or if Franchisee Defendants otherwise failed to comply with its contractual obligations.

139. At all relevant times during their respective time of ownership, Franchisee Defendants acted as the agent of the Hilton Defendant when operating the subject Hilton Garden Inn.

140. Hilton Defendant and Franchisee Defendants, during their respective years of ownership, shared control of the terms and conditions of the employment of staff at the subject Hilton Garden Inn and, therefore, the Hilton Defendant and Franchisee Defendants are joint employers. Upon information and belief, Hilton Defendant exercised control over the terms and conditions employment of staff at the subject Hilton Garden Inn by advertising employment opportunities, making or influencing employment decisions, setting employee wages, and adopting standardized rules of operations that govern the day-to-day work of the employees.

### VII. Hilton Brand Defendant is jointly responsible for the trafficking of Jane Doe (J.R.F.)

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                    48

141. Hilton Brand Defendant was a participant in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

142. Upon information and belief, operation of the subject properties was part of a single unified operation by Hilton Brand Defendant. Upon information and belief, Hilton Brand Defendant shared a common parent company, was subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Hilton Brand Defendant acted jointly to own, operate, control, manage, and supervise the subject property. As an integrated enterprise and/or joint venture, Hilton Brand Defendant was separately and jointly responsible for compliance with all applicable laws.

**VIII. Defendants are Jointly and Severally Liable for Jane Doe (J.R.F.)'s Damages.**

143. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (J.R.F.).

144. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (J.R.F.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

145. Jane Doe (J.R.F.) incorporates all other allegations.

**I.  Cause of Action 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendant)**

146.  Jane Doe (J.R.F.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

147.  Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because they:

a.  violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (J.R.F.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Subject property.

b.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Subject property.

148.  Violations of 18 U.S.C §1595(a) by Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (J.R.F.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Subject property.

**II.  Cause of Action 2: Beneficiary Liability under §1595 (a) of the TVPRA. (All Defendants)**

149.  Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the

person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

150. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendant knew or should have known was engaged in a violation of the TVPRA.

151. **Venture 1:** Through acts and omissions more fully described throughout this pleading, each Defendant received a financial benefit from participating in ongoing business relationship, referred to herein as Venture 1, with the population of sex traffickers, including Jane Doe (J.R.F.)'s traffickers, operating at the subject Hilton Garden Inn. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

   a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the subject hotels by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the subject Hilton Garden Inn engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of J.R.F.

   b. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while Jane Doe (J.R.F.) 's trafficker was able to rent a secure venue to earn profits by trafficking Jane Doe (J.R.F.) Each Defendant participated in the venture by continually renting rooms to Jane Doe (J.R.F.)'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Jane Doe (J.R.F.)'s trafficking.

c. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (J.R.F.), in the rooms of the subject hotels.

d. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

e. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (J.R.F.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including J.R.F.). Each Defendant received a financial benefit every time a trafficker rented a room.

f. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (J.R.F.)'s trafficking).

152. **Venture 2**: Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating in commercial venture, referred to herein as Venture 2, with the other Defendants operating the subject Hilton Garden Inn. Each Defendant violated the TVPRA through participation, as a beneficiary, in this commercial venture as follows:

a. This is a commercial venture that resulted from the business relationship Hilton and Franchisee Defendants, during their respective years of ownership, to operate the subject Hilton Garden Inn with a common objective of maximizing revenue at the hotels, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the subject Hilton Garden Inn, including the trafficking of Jane Doe (J.R.F.).

c. Hilton and Franchisee Defendants knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. Franchisee Defendants knowingly benefited from this venture by generating revenue directly from operation of the hotel. Hilton knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the hotel, which increased every time a room was rented to a trafficker.

e. Franchisee Defendants participated in this venture through its role providing "boots on the ground" at the subject Hilton Garden Inn. Hilton participated in this venture by (1) continuing the ongoing business relationship despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

### III. Cause of Action 3: Vicarious Liability for TVPRA Violations. (Hilton Defendant)

153. Franchisee Defendants acted as the actual agent of Hilton when operating the subject Hilton Garden Inn.

154. In ways further described above, Hilton exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendants, during their respective years of ownership, to operate the subject Hilton Garden Inn.

155. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

156. As a result of the relationship between Hilton Defendants and Franchisee Defendants, Hilton is vicariously liable for the acts of Franchisee Defendants, including at the subject Hilton Garden Inn. Factors that support this allegation are that Hilton shared

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al* 53

profits, standardized employee training, standardized and strict rules of operations, Hilton controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Thus, Hilton retained control, or the right to control, the mode and manner of work contracted for.

157.    As alleged above, Franchisee Defendants are directly liable to Jane Doe (J.R.F.) for violations of the TVPRA, as a beneficiary under 18 U.S.C §1595(a). Hilton is vicariously liable to Jane Doe (J.R.F.) for that same violation.

158.    Each Defendants' failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the subject Hilton Garden Inn, enabled and contributed to the sex trafficking of J.R.F.

159.    Hilton Defendant are also vicariously liable for the acts and omissions of the staff at the subject Hilton Garden Inn because Hilton, together with Franchisee Defendants, acted as the joint employer of these employees because Hilton and Franchisee Defendants jointly control the terms and conditions of their employment.

## DAMAGES

160.    Hilton Defendant and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (J.R.F.) to sustain legal damages.

161.    Hilton Defendant and Franchisee Defendants are joint and severally liable for all past and future damages sustained by J.R.F.

162.    Jane Doe (J.R.F.) is entitled to be compensated for personal injuries and economic damages, including:

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al*                                      54

a. Actual damages;

b. Direct damages;

c. Incidental and consequential damages;

d. Mental anguish and emotional distress damages (until trial and in the future);

e. Lost earning capacity in the future;

f. Loss of self-esteem and self-worth;

g. Necessary medical expenses;

h. Physical pain and suffering;

i. Physical impairment;

j. Emotional impairment;

k. Unjust enrichment; and

l. Penalties.

163. Jane Doe (J.R.F.) is entitled to exemplary damages.

164. Jane Doe (J.R.F.) is entitled to recover attorneys' fees and costs of court.

165. Jane Doe (J.R.F.) is entitled to pre- and post-judgment interest at the maximum legal rates.

166. A constructive trust should be imposed on Hilton Defendants and Franchisee Defendants, and the Court should sequester any benefits or money wrongfully received by Hilton or Franchisee Defendants for the benefit of J.R.F.

## DISCOVERY RULE

To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendant(s) hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Plaintiff did not know what "human trafficking" was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than ten years before suit was filed. Jane Doe (J.R.F.) invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

## JURY TRIAL

167. Jane Doe (J.R.F.) demands a jury trial on all issues.

## RELIEF SOUGHT

168. Wherefore, Jane Doe (J.R.F.) respectfully requests judgment against Hilton Defendants and Franchisee Defendants, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

*Jane Doe v. Hilton Domestic Operating Co., Inc., et al* 56

Dated:  December 30, 2024                    Respectfully submitted,

By: /s/ David Henderson
David Henderson, ABA #9806014
LAW OFFICES OF DAVID HENDERSON
Attorney for Jane Doe (J.R.F.)